IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-129

No. 216A21

Filed 16 December 2022

IN THE MATTER OF: L.Z.S.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from orders entered on 26 March 2021 by Judge Eula E. Reid in District Court, Chowan County, and on writ of certiorari to review orders entered on 13 August 2020 and 22 September 2020 by Judge Eula E. Reid in District Court, Chowan County. Heard in the Supreme Court on 22 March 2022.

*Lauren Arizaga-Womble for petitioner-appellee Chowan County Department of Social Services.*

*A. Grant Simpkins for appellee Guardian ad Litem.*

*Wendy C. Sotolongo, Parent Defender, by Annick Lenoir-Peek, Deputy Parent Defender, for respondent-appellant father.*

MORGAN, Justice.

¶ 1    Respondent-father appeals from several orders of the District Court, Chowan County: an order permitting respondent-father's court-appointed counsel to withdraw from representation of respondent-father in the case proceedings; an order ceasing efforts to reunify respondent-father with his son, Leon[1]; and two orders collectively

---

[1] A pseudonym is used to protect the identity of the juvenile and to promote ease of reading.

terminating respondent-father's parental rights to Leon. Because the record is completely devoid of any mention of notice to respondent-father of the prospect that his appointed counsel might withdraw from the case, we reverse the trial court's order allowing respondent-father's appointed counsel to withdraw and the trial court's order ceasing reunification efforts and remand this case to the trial court for additional proceedings consistent with this opinion.

## I.  Factual and Procedural History

On 17 April 2019, the Chowan County Department of Social Services (DSS) obtained nonsecure custody of one-year-old Leon and removed the child from the custody of his mother, who is not a party to this appeal. DSS also filed a juvenile petition on 17 April 2019, alleging that Leon was a neglected juvenile because he had not received proper care, supervision, or discipline from his parents. Respondent-father, whose paternity had not yet been established at the time that the petition was filed, was incarcerated at Columbus Correctional Institution at the time that DSS initiated the matter. Respondent-father was served on 24 June 2019 with the juvenile petition, along with a summons for an adjudication hearing scheduled for 27 June 2019. Respondent-father was absent from the 27 June 2019 adjudication hearing due to his ongoing incarceration. Respondent-father's counsel, who had been provisionally appointed by the trial court to represent respondent-father, then moved to withdraw from representation of respondent-father; the trial court allowed the motion to

withdraw. At the adjudication hearing, Leon's mother stipulated that the child was a neglected juvenile, prompting the trial court to find that Leon was neglected as defined in N.C.G.S. § 7B-101(15). At a disposition hearing which was also conducted in the case on 27 June 2019, the record reflects that respondent-father was represented by newly appointed counsel. The trial court ordered a permanent plan of reunification of Leon with his mother, with no mention of respondent-father's continued involvement in the case. A review hearing was scheduled for 22 August 2019.

¶ 3        At the 22 August 2019 review hearing, respondent-father's new appointed counsel appeared on respondent-father's behalf. In an order entered on 23 September 2019 which resulted from the 22 August review hearing, the trial court found that respondent-father was incarcerated at Columbus Correctional Institution, located a considerable distance away from the juvenile Leon's home county of Chowan. The trial court also found that, since Leon's birth, respondent-father had "not provided the juvenile with any care, supervision or discipline and since the filing of [the neglect] petition has not been able to do so due to his incarceration." The 23 September 2019 order further reflected that respondent-father "is expected to be released from prison in November of 2019 and would like to have a relationship with the juvenile and would like to be considered as a placement resource for the juvenile." The trial court ordered a permanent plan of custody for Leon with his mother and a

concurrent plan of custody for the child with respondent-father or a court-approved caretaker.

¶ 4        Between June 2019 and October 2019, DSS engaged with respondent-father telephonically while he was still incarcerated, including facilitating respondent-father's attendance at Child and Family Team Meetings and obtaining respondent-father's cooperation with an Out-of-Home Agreement. A DNA test ordered by the trial court confirmed that respondent-father was the biological father of Leon, whose paternity had remained at issue due to suspicion that Leon's mother had been married to another man at the time of Leon's birth. Respondent-father exhibited misconduct at the correctional facility shortly prior to his initial release date in November 2019, which caused a delay of respondent-father's release from incarceration until 21 December 2019. After his release, respondent-father planned to live and work with his father in Moyock, North Carolina, and indicated a desire to serve as a placement for Leon.

¶ 5        Upon respondent-father's release from prison on 21 December 2019, his contact with the trial court and DSS was sparse and ineffectual. When respondent-father left Columbus Correctional Institution, he did not contact DSS in order to provide an address at which to locate him. DSS contacted the father of respondent-father by telephone on 2 January 2020 in an effort to ascertain the whereabouts of respondent-father. Respondent-father called DSS by telephone two days later but would not

provide an address; instead, respondent-father indicated that he would contact DSS by telephone at a later date in order to schedule a meeting. After DSS did not receive communication from respondent-father within a reasonable period of time, the agency attempted to contact respondent-father on 20 January 2020 at the telephone number that he had provided but did not reach him. DSS unsuccessfully tried to contact respondent-father again by telephone on 5 February 2020, but his telephone was off and no voicemail message opportunity was available. On 6 February 2020, during a visitation session between Leon and the child's mother, DSS was able to make contact with respondent-father utilizing the mother's Facebook social media account to inform him of an upcoming Child and Family Team Meeting. Over the ensuing three months, DSS regularly attempted to contact respondent-father by telephone, and he would answer the calls on some occasions and ignore the calls at other times. During the brief conversations that DSS social workers were able to have with respondent-father, he would (1) refuse to provide an address so that DSS could complete a home assessment for the possible placement of Leon with respondent-father, (2) indicate that he would call DSS back via telephone with an address for the home assessment on a later date, and then (3) fail to call DSS back by telephone in order to provide the promised address. Respondent-father participated over the telephone in a Child and Family Team Meeting on 6 May 2020 during which respondent-father indicated that he was working for a construction company in

Virginia, but respondent-father did not provide any information about his employer or his address. When a DSS representative asked respondent-father during a telephone call if respondent-father had provided any support for Leon since his release from incarceration, respondent-father responded that he considered DSS to be disrespecting him, and respondent-father ended the call. Respondent-father never provided a home address to DSS.

¶ 6    The trial court conducted a permanency planning review hearing during the two-day period of 11 June 2020 and 22 June 2020. Respondent-father did not appear at the hearing but was represented by his court-appointed counsel. The trial court maintained Leon's permanent plan as reunification with his parents with a concurrent plan of custody with a court-approved caretaker, and found that the barriers to reunification for respondent-father specifically were his lack of a relationship with Leon, respondent-father's failure to provide respondent-father's address to DSS, and respondent-father's lack of participation in this matter with DSS. The trial court ordered respondent-father to provide his home address to DSS and to engage in an Out-of-Home Services Agreement. The tribunal set the next review hearing for 13 August 2020.

¶ 7    On the day of the 13 August 2020 permanency planning review hearing and prior to its start, respondent-father's court-appointed attorney filed a written notice to withdraw as counsel. The motion explained that respondent-father had not

appeared at any of the court proceedings since respondent-father's release from prison, despite advising his counsel that he would do so. The motion further asserted that, "despite his attorney's requests," respondent-father had failed to contact his attorney and failed to be present for the case's court proceedings. On the same day of 13 August 2020 on which the motion to withdraw was filed, the trial court granted the motion. The record does not indicate that respondent-father was served with notice that his court-appointed counsel was withdrawing from the case or that there was any attempt to serve respondent-father with such notice. After respondent-father's counsel was allowed to withdraw from representation of respondent-father after regularly appearing on behalf of the parent at the case's court proceedings, the trial court then went on to conduct the scheduled permanency planning review hearing in the absence of respondent-father or any legal representation on his behalf. Following the solicitation of testimony from a DSS social worker and the juvenile's guardian ad litem, the trial court entered an order on 22 September 2020 pursuant to the 13 August 2020 permanency planning review hearing. In the order, the trial court found that the return of Leon to the custody of either parent "would be contrary to the welfare of said child at this time" and that continued efforts to reunify Leon with respondent-father "would clearly be futile or would be inconsistent with the child's health and safety." The trial court eliminated reunification of the juvenile Leon with either parent as a permanent plan, and instead the trial court identified

adoption as a primary plan with a concurrent plan of guardianship with a relative or court-approved caretaker.

¶ 8    In the months following the 13 August 2020 permanency planning review hearing, DSS attempted to contact respondent-father a total of eleven times through the mail and by telephone. DSS sent a letter to respondent-father via certified mail on 24 August 2020 which informed him of the trial court's decision to cease reunification efforts; respondent-father signed the receipt of the certified letter on 8 September 2020. On 9 September 2020, DSS sent to respondent-father a second certified letter with identical content, for which respondent-father's signature indicated receipt on 16 September 2020. On two occasions, DSS was able to successfully contact respondent-father by way of telephone; however, respondent-father became upset during each of the calls, refused to meet with DSS, and ended each call.

¶ 9    On 20 November 2020, DSS filed a petition to terminate respondent-father's parental rights to the juvenile Leon, on the grounds of neglect under N.C.G.S. § 7B-1111(a)(1), failure to make reasonable progress in correcting the conditions which led to Leon's removal from his parents' custody in the first instance under N.C.G.S. § 7B-1111(a)(2), failure to pay a reasonable portion of the costs of care for Leon despite the ability to do so under N.C.G.S. § 7B-1111(a)(3), and abandonment under N.C.G.S. § 7B-1111(a)(7). *See* N.C.G.S. § 7B-1111(a) (2021). Respondent-father was appointed

the same attorney for the termination of parental rights matter as had been allowed to withdraw at the 13 August 2020 hearing. At the termination of parental rights adjudication and disposition hearings which began on 14 January 2021 and resumed on 11 February 2021, respondent-father attended with his appointed counsel. The trial court heard testimony from DSS social workers, Leon's guardian ad litem, and respondent-father himself. Respondent-father's attorney cross-examined DSS's witnesses and gave thorough closing arguments on respondent-father's behalf. In two separate orders which were both entered on 26 March 2021, the trial court found that all four of the alleged grounds for the termination of respondent-father's parental rights existed and determined that Leon's best interests would be served by the termination of respondent-father's parental rights.

## II. Analysis

¶ 10      Respondent-father appeals from the trial court's 13 August 2020 order which allowed his court-appointed counsel to withdraw from representation of respondent-father and from the trial court's 22 September 2020 order which eliminated reunification as a permanent plan for Leon. In addition to these contentions, respondent-father also submits that the trial court's orders which terminated his parental rights must be vacated if this Court determines that the trial court's order which eliminated reunification as a permanent plan should be vacated, according to N.C.G.S. § 7B-1001(a2). *See* N.C.G.S. § 7B-1001(a2) (2019).

¶ 11    North Carolina law is replete with demonstrations of the established right of a parent to be represented by legal counsel in proceedings in which a child of the parent is in the nonsecure custody of a county's department of social services. Subsection 7B-602(a) of the General Statutes of North Carolina establishes that "[i]n cases where the juvenile petition alleges that a juvenile is abused, neglected, or dependent, the parent has the right to counsel and to appointed counsel in cases of indigency unless that person waives the right." N.C.G.S. § 7B-602(a) (2021). Subsection 7B-906.1(a) requires the trial court to conduct a hearing in such abuse, neglect, and dependency cases "within 90 days from the date of the initial dispositional hearing" and "hearings shall be held at least every six months thereafter," with the hearing "be[ing] designated as [a] permanency planning hearing" in the event that "custody has been removed from a parent." N.C.G.S. § 7B-906.1(a) (2021). In a termination of parental rights case, N.C.G.S. § 7B-1101.1(a) guarantees that "[t]he parent has the right to counsel, and to appointed counsel in cases of indigency, unless the parent waives the right." N.C.G.S. § 7B-1101.1(a) (2021). As to waiver of counsel by parents in cases in which the outcomes of permanency planning review hearings may result in termination of parental rights proceedings, this Court has adopted the standard that " '[a] finding that a defendant has forfeited the right to counsel' has been restricted to situations involving 'egregious dilatory or abusive conduct on the part of the [litigant].' " *In re K.M.W.*, 376 N.C. 195,

209 (2020) (alterations in original) (quoting *State v. Simpkins*, 373 N.C. 530, 541 (2020)). Furthermore, as we also noted in our decision in *In re K.M.W.*, "Rule 16 of the General Rules of Practice prohibits an attorney from withdrawing from his or her representation of a client in the absence of '(1) justifiable cause, (2) *reasonable notice to the client*, and (3) the permission of the court.' " *Id.* (emphasis added) (quoting N.C. Gen. R. Prac. Super. & Dist. Ct. 16). "[T]his 'general rule presupposes that an attorney's withdrawal has been properly investigated and authorized by the court,' so that '[w]here an attorney has given his client no prior notice of an intent to withdraw, the trial judge has no discretion [to allow withdrawal].' " *Id.* (second alteration in original) (quoting *Williams & Michael, P.A. v. Kennamer*, 71 N.C. App. 215, 516 (1984)). "Under no circumstances may an attorney of record be permitted to withdraw on the day of trial without first satisfying the court that he has given his client *prior* notice which is both specific and reasonable." *Williams & Michael, P.A.*, 71 N.C. App. at 216–17.

¶ 12    In *In re K.M.W.*, two children were removed from the care of their mother after the local department of social services (DSS) became involved with the parents after the agency received a report concerning the alleged occurrence of domestic violence between the mother and her boyfriend in the presence of the children and the alleged administration of medicine to the children in order to get the children to sleep. *In re K.M.W.*, 376 N.C. at 196. DSS filed a petition alleging that the children were

neglected juveniles, and the trial court determined that the children were neglected juveniles. *Id.* at 197. After a number of hearings in the matter which included permanency planning review hearings conducted in December 2017, May 2018, August 2018, and November 2018, the respondent-mother indicated to the trial court at a hearing conducted on 8 January 2019 that she wanted to waive her right to a court-appointed attorney in the pending termination of parental rights case and that she desired to hire her own counsel for the matter. *Id.* at 197–200. The court-appointed counsel continued to represent the respondent-mother in the underlying neglect proceeding, while on 9 January 2019 the trial court entered an order allowing the court-appointed attorney's 3 January 2019 motion to withdraw as the respondent-mother's counsel based upon the respondent-mother's articulated wish to privately retain an attorney to represent the respondent-mother in the termination proceeding. *Id.* at 199–200. After the fifth permanency planning review hearing which occurred on 16 April 2019, the trial court relieved the respondent-mother's court-appointed attorney of representation responsibilities in the underlying neglect case after counsel was present for the hearing and the respondent-mother was absent, and in light of the fact that the respondent-mother had not been in contact with her court-appointed attorney since 20 November 2018. *Id.* at 200. On 30 April 2019, the respondent-mother's privately retained counsel filed motions to withdraw as the respondent-mother's attorney in the termination of parental rights phase of the case.

*Id.* at 201. We observed that "[a]lthough the withdrawal motions were served upon counsel for DSS, they do not appear to have been served upon respondent-mother." *Id.* During a hearing that transpired on 14 May 2019 in the absence of the respondent-mother, her privately retained counsel reported to the trial court that the respondent-mother had requested him to withdraw from the termination of parental rights proceedings and that he had been unable to secure the respondent-mother's presence for the hearing. *Id.* Without further inquiry, the trial court granted counsel's motion to withdraw. *Id.* The respondent-mother was subsequently served with the trial court's order which allowed the withdrawal of her attorney. *Id.* A termination of parental rights hearing was conducted on 11 June 2019; the respondent-mother arrived late for the proceedings, which began in her absence, and she represented herself. *Id.* at 201–02. Ultimately, the trial court announced in open court that grounds existed for the termination of the respondent-mother's parental rights and that her parental rights would be terminated. *Id.* at 202. The trial court formalized these determinations in an order issued on 27 June 2019. *Id.* On appeal to this Court, the respondent-mother argued that the record in the case did not show that she had received any notice that her privately retained attorney would seek to withdraw from representing her. *Id.* We agreed with the respondent-mother that the trial court erred by allowing the motion to withdraw of the respondent-mother's privately retained attorney, as we reasoned, among several considerations, that

> [a] careful examination of the record . . . indicates that
> neither the certificate of service attached to [the
> respondent-mother's attorney's] withdrawal motion nor
> any related correspondence shows that respondent-mother
> was served with a copy of the withdrawal motion prior to
> the date upon which [the respondent-mother's attorney]
> was allowed to withdraw. On the contrary, the certificate
> of service attached to [the respondent-mother's attorney's]
> withdrawal motion appears to reflect that the only party
> upon whom that motion was served was DSS.

*Id.* at 211.

¶ 13        In the present case, just as in *In re K.M.W.*, respondent-father had the

statutory right to counsel in this matter which resulted from his juvenile son Leon

being taken into the nonsecure custody of DSS due to the trial court's determination

of the child's status as a neglected juvenile and remained throughout the trial court's

administration of permanency planning review hearings and the eventual

termination of parental rights hearing. Since respondent-father refrained from

maintaining consistent communication with DSS and with his court-appointed

counsel in a manner similar to the respondent-mother's failure to stay in contact with

her counsel in *In re K.M.W.*, respondent-father's conduct in this regard cannot be

deemed to be so egregious, dilatory, or abusive here so as to constitute a waiver or

forfeiture of counsel in light of the determination that the respondent-mother's

inconsistent interaction with her counsel in *In re K.M.W.* did not rise to such a level.

Based on the trial record in *In re K.M.W.*, the respondent-mother was not provided

with reasonable notice that her privately retained attorney would request the trial

court to relieve him from representation of the respondent-mother at the termination of parental rights hearing, after the trial court had excused the respondent-mother's court-appointed attorney from representing the parent in the pivotal underlying neglect proceedings. Likewise, respondent-father in the instant case was not apprised in advance by his counsel that the attorney would pursue withdrawal from the case on the day of the 13 August 2020 permanency planning review hearing and the record is bereft of any such notice to respondent-father. In both *In re K.M.W.* and the case at bar, the trial court allowed the motion to withdraw of the parent's attorney, without prior notice to the parent being apparent from the trial record, on the same day of the hearing during which the attorney's motion to withdraw was formally considered by the trial court, in the absence of the affected parent who had a statutory right to counsel at the hearing at which the motion to withdraw was allowed and without further inquiry by the trial court appearing in the record. This confluence of salient circumstances between the two cases mandates reversal here.

¶ 14     Although this Court has decided the case of *In re T.A.M.*, 378 N.C. 64, 2021-NCSC-77, which presented issues similar to those which are found in the current case but compelled us to conclude that the trial court had the discretion to properly grant the motion of the parent's attorney to withdraw from representation, the differences between these cases regarding the critical concept of prior notice provide the important distinctions between them so as to justify their different outcomes. In *In*

*re T.A.M.*, the local DSS filed a petition which alleged that the child Tam was a neglected juvenile based on reports that the respondent-mother and the respondent-father were engaged in activities of substance abuse, domestic violence, and criminal offenses involving controlled substances. *Id.* ¶¶ 2, 7. The trial court found that the juvenile Tam[2] was neglected after an adjudicatory hearing and the parents' stipulation that the petition's allegations were accurate. *Id.* ¶ 8. Subsequently, Tam was placed in the nonsecure custody of DSS by the trial court. *Id.* After the respondent-mother gave birth to the child Kam while the parents were still involved in trial proceedings relating to Tam, DSS filed a petition in which it was alleged that the newborn child was a neglected juvenile. *Id.* ¶¶ 11–12. The trial court issued an order which authorized DSS to obtain nonsecure custody of Kam. *Id.* ¶ 12. As they did with their child Tam, the parents stipulated to the existence of the allegations contained in the DSS petition regarding Kam, and the trial court found that Kam was a neglected juvenile. *Id.* ¶ 14. Permanency planning and review hearings were conducted in the case. *Id.* ¶¶ 15–16. Eventually, DSS filed petitions to terminate the parental rights of both parents. *Id.* ¶ 17. The respondent-father's whereabouts were unknown at the time of the filing of the termination petitions. *Id.* After the respondent-father was unsuccessfully given notice of the termination of parental

---

[2] In *In re T.A.M.*, pseudonyms were used to protect the identity of the juveniles and to promote ease of reading.

rights proceedings by publication, the trial court granted the motion of the respondent-father's counsel to withdraw from representation of the respondent-father due to the parent's failure to maintain contact with his attorney. *Id.* Several months later, the respondent-father appeared in the matter, and the trial court therefore reappointed the same attorney to represent the respondent-father and continued the hearing until three-and-one-half months later. *Id.* Upon the arrival of the new date for the termination of parental rights hearing, counsel for the respondent-father filed another motion to withdraw based upon the respondent-father's lack of communication with his attorney, the attorney's inability to know the respondent-father's wishes regarding the case, and the attorney's resulting lack of ability to properly represent the respondent-father's interests at the termination hearing. *Id.* Without the presence of the respondent-father's counsel due to the trial court's allowance of the attorney's motion to withdraw, and in the absence of the respondent-father, the trial court conducted the termination of parental rights hearing and ultimately terminated the parental rights of both parents. *Id.* ¶ 18. Both parents appealed to this Court, with the respondent-father's arguments being germane to the case sub judice in light of his contention that the trial court erred in granting his counsel's motion to withdraw at the termination of parental rights hearing in light of the respondent-father's statutory right to counsel. *Id.* ¶¶ 18–19. In determining that the trial court did not abuse its discretion in *In re T.A.M.* to grant

the motion to withdraw of the respondent-father's counsel—as opposed to the trial

court's presumed exercise of discretion in the present case which it did not possess

pursuant to *In re K.M.W.*—we emphasized the following indications of notice to the

respondent-father which were given to the parent in *In re T.A.M.* regarding the

potential withdrawal of counsel from representation which do not exist regarding the

potential withdrawal of counsel from representation of respondent-father here:

> The trial court first advised respondent-father of his responsibility to attend all trial court hearings and maintain communication with his court appointed attorney at the first appearance hearing on DSS's juvenile petition of neglect for Tam held on 11 October 2016. Furthermore, the trial court advised respondent-father that if he failed to attend trial court hearings or failed to maintain communication with his attorney, his attorney "may ask and be permitted to withdraw as his attorney of record, and the case may proceed without him being represented by an attorney."
>
> . . . .
>
> . . . The trial court advised respondent-father for a third time that it was "his responsibility to maintain contact with his appointed attorney and . . . to attend all [trial c]ourt hearings" and that if he failed to communicate or attend all trial court hearings, his attorney "may ask and be permitted to withdraw as his attorney of record, and the case may proceed without him being represented by an attorney."
>
> . . . .
>
> . . . Counsel for respondent-father informed the trial court that she had spoken to respondent-father that day [of

the 30 January 2020 session of the termination of parental rights hearing] and informed respondent-father that if he did not appear at the termination-of-parental-rights hearing, she "would need to withdraw and the case would proceed in his absence." The attorney also stated that respondent-father did not object to his attorney's withdrawal as counsel. The trial court then granted respondent-father's attorney's motion to withdraw.

*Id.* ¶¶ 22, 25, 27 (third and fourth alterations in original) (footnote omitted).

¶ 15  We summarized these circumstances in which the respondent-father in *In re T.A.M.* was given notice that his counsel might be allowed to withdraw from representation in the event that the respondent-father failed to remain in communication with his attorney throughout the proceedings as we recounted that "[t]he trial court advised respondent-father on three separate occasions that it was his responsibility to maintain contact with his attorney and attend all trial court hearings." *Id.* ¶ 29. In addition to the trial court's efforts in conveying notice to the respondent-father in *In re T.A.M.* about the prospects of the withdrawal of the parent's counsel from representation, the respondent-father's attorney also reinforced the potential of counsel's withdrawal with notice being given to the respondent-father that this could occur if the respondent-father failed to heed the trial court's admonitions on this subject. In further drawing the stark distinctions between the procedural facts of *In re T.A.M.* and the present case with regard to the withdrawal-of-counsel issue, it is particularly noteworthy that in *In re T.A.M.*, the respondent-father's attorney spoke with the respondent-father on the day of the

termination hearing prior to the beginning of the hearing and directly informed the parent that counsel would need to withdraw from the case and the termination hearing would occur in the absence of the respondent-father if the respondent-father was not present for it. On the other hand, respondent-father's court-appointed attorney in the present case—as well as the privately retained attorney for the respondent-mother in *In re K.M.W.*—did not provide prior notice to the parent who had a statutory right to counsel that the attorney would seek to withdraw from representation at the hearing at which the parent had the statutory right to counsel. Furthermore, in both the present case and in *In re K.M.W.*, as opposed to *In re T.A.M.*, the trial court did not engage in further inquiry or expressly provide notice to the affected parent prior to the trial court granting the motion to withdraw from representation by counsel for the parent.

¶ 16        This Court stresses, as we similarly underscored in *In re T.A.M.*, that "such cases as these are fact-specific and hence dependent on the unique facts of any given case." *Id.* ¶ 30. Even with the differing outcomes of *In re K.M.W.*, *In re T.A.M.*, and the case at bar as a result of the varying facts which are singular to each case, the principle which is consistently implemented in, and commonly shown by, all of them is that "the trial court's discretion [to allow a respondent-parent's counsel to withdraw from representation] only comes into play when the parent has been provided adequate notice of counsel's intent to seek leave of court to withdraw and

the trial court has adequately inquired into the basis for counsel's withdrawal motion." *Id.* ¶ 28 (quoting *In re K.M.W.*, 376 N.C. at 211). Completely absent from the record in the present case is any indication of notice to respondent-father from his counsel that the attorney was seeking to withdraw, any indication on the part of respondent-father's counsel that reasonable efforts were made by the attorney to provide notice of counsel's intention to withdraw, or any inquiry conducted by the trial court regarding the basis for the motion to withdraw of respondent-father's counsel. These circumstances require both a reversal of the trial court's order which allowed respondent-father's counsel to withdraw from representation and a remand of the case to the trial court in order to reconstitute the permanency planning review hearing originally held on 13 August 2020 at which the trial court erroneously permitted respondent-father's counsel to withdraw and where the trial court shall reconsider the propriety of ongoing reunification efforts for the juvenile Leon and respondent-father.

¶ 17 In light of our conclusion in *In re K.M.W.*, which was expressly based on the unequivocal premises espoused in the Court of Appeals case of *Williams & Michael, P.A.* and the governance of Rule 16 of the General Rules of Practice, we determine in the present case—consistent with the outcome in *In re K.M.W.*—that the trial court erred in allowing counsel for respondent-father to withdraw from representation without proper notice evident in the record of the attorney's intent to withdraw as

counsel and without making further inquiry about the circumstances regarding the motion, in the absence of respondent-father at a hearing at which he had a statutory right to counsel, had not waived or forfeited counsel, and consequently did not have counsel to represent his parental interests.

## III. Conclusion

¶ 18        Based upon the foregoing reasoning, we reverse the trial court's 13 August 2020 order allowing respondent-father's counsel to withdraw, reverse the trial court's 22 September 2020 order eliminating reunification as the case's permanent plan, and remand the case to the trial court for further proceedings not inconsistent with this opinion. Upon remand, the trial court is to determine respondent-father's eligibility for court-appointed counsel, appoint counsel for respondent-father if the parent is entitled to court-appointed counsel, and reconstitute the permanency planning review hearing which was originally conducted on 13 August 2020. In the event that the trial court determines upon remand that reunification efforts were properly ceased on 13 August 2020, then the trial court shall enter an order to that effect and the trial court's order which terminated the parental rights of respondent-father shall remain undisturbed. In the event that the trial court determines upon remand, after respondent-father's exercise or waiver of his statutory right to counsel, that reunification efforts were improperly ceased on 13 August 2020, then the trial court shall enter an order to that effect and the trial court's order which terminated the

parental rights of respondent-father shall be vacated, without prejudice to DSS to pursue further proceedings.

REVERSED AND REMANDED.

Justice BERGER dissenting.

Because the trial court's order allowing withdrawal of counsel should be affirmed, as should the order eliminating reunification as the permanent plan, I respectfully dissent.

## I.    Withdrawal of Counsel

Parents have a statutory right to counsel in cases when the parent is named in a juvenile petition alleging abuse, neglect, or dependency. N.C.G.S. § 7B-602(a) (2021). Respondent-father was served with the juvenile petition on June 24, 2019, and it is undisputed that counsel was appointed for him on June 27, 2019.[1] However, from the time of counsel's appointment until the motion to withdraw was allowed on August 13, 2020, respondent-father failed to contact his counsel, failed to appear at any hearing, and failed to work with the department to have a role in his child's life

---

[1] Although unclear from the record, it appears that attorney Brandon Belcher initially may have been appointed as provisional counsel as he was allowed to withdraw at the June 27, 2019 hearing. There is no order of appointment concerning Mr. Belcher in the record, and the trial court's order allowing Mr. Belcher's withdrawal has a blank in which the trial court should have listed the grounds for withdrawal, but that blank was not completed.

Attorney Preston Tyndall appears to have been appointed following Mr. Belcher's withdrawal. However, Mr. Tyndall's motion to withdraw states that he was appointed as provisional counsel, even though the notice of appointment does not designate that Mr. Tyndall was appointed as provisional counsel. Given the lack of clarity in the record, remand to the trial court for additional findings because if Mr. Tyndall was indeed provisional counsel, this issue may be controlled by the plain language of N.C.G.S. § 7B-602. *See* N.C.G.S. § 7B-602(a) (2021) ("[T]he court shall dismiss the provisional counsel if the respondent parent . . . [d]oes not appear at the hearing . . . .").

I also note that reliance on Rule 16 of the General Rules of Practice as in *In re K.M.W.*, 376 N.C. 195, 851 S.E.2d 849 (2020), is misplaced as it relates to provisional counsel because the rule requiring notice contradicts the plain language of the statute. Even if Rule 16 was applicable, the record contains no transcript of the hearing on the motion to withdraw such that we are able to discern what efforts were made by counsel to contact respondent-father. Remand, again, may be appropriate for additional findings on this issue.

despite having been served with the petition.

¶ 21        As this Court recently stated, "[a] parent, by repeatedly failing to communicate with appointed counsel, by failing to attend numerous hearings, and by admittedly avoiding receiving mail and other communications from [the department] and other interested parties," should not be permitted to "successfully manipulate the judicial system to seriously delay [ ] termination of parental rights proceeding[s]." *In re T.A.M.*, 378 N.C. 64, 2021-NCSC-77, ¶ 31. Sanctioning obstructive and dilatory tactics by uninterested parents "impair[s] judicial efficiency and drain[s] already scarce judicial resources, while thwarting the over-arching North Carolina policy to find permanency for the juvenile at the earliest possible age." *Id*.; *see also* N.C.G.S. § 7B-1100(2) (2021).

¶ 22        Here, respondent-father was served with a petition alleging that L.Z.S. was a neglected juvenile because he did not receive proper care, supervision, or discipline. Despite service of the petition and, therefore, knowledge of the proceedings affecting his rights as a parent, respondent-father did not appear at the permanency planning hearings that occurred in February and June 2020 prior to filing of the motion to withdraw. Nor was respondent-father present on August 13, 2020, when the motion to withdraw was allowed by the trial court. In his motion to withdraw, respondent-father's attorney noted that respondent-father had failed to appear at any hearing since his release from prison in December 2019 and had never contacted his attorney.

Further, the record is replete with findings that respondent-father failed to contact the department and failed to provide an address even after the department's numerous attempts to establish contact with him.

Consistent with our holding in *In re T.A.M.*, and because "a lawyer cannot properly represent a client with whom he has no contact," *Dunkley v. Shoemate*, 350 N.C. 573, 578, 515 S.E.2d 442, 445 (1999), the trial court did not err when it allowed counsel to withdraw.

## II.    Sufficiency of Findings to Eliminate Reunification

This Court will review a permanency planning review order to determine " 'whether there is competent evidence in the record to support the findings [of fact] and whether the findings support the conclusions of law.' The trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *In re A.P.W.*, 378 N.C. 405, 2021-NCSC-93, ¶ 14 (alteration in original) (quoting *In re H.A.J.*, 377 N.C. 43, 2021-NCSC-26, ¶ 14). Further, "uncontested findings are binding on appeal." *Id.* ¶ 14.

This Court may take the findings from the order eliminating reunification as the permanent plan together with the order terminating parental rights in determining whether the findings suffice. *In re A.P.W.*, ¶ 16. This Court considers both orders together. *Id.*

"At any permanency planning hearing pursuant to [N.C.]G.S. [§] 7B-906.1, the

court shall adopt one or more . . . permanent plans the court finds is in the juvenile's best interest." N.C.G.S. § 7B-906.2(a) (2021). "Reunification shall be a primary or secondary plan unless the court made written findings under . . . [N.C.]G.S. [§] 7B-906.1(d)(3) . . . or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C.G.S. § 7B-906.2(b). Pursuant to N.C.G.S. § 7B-906.1(d), the trial court must "make written findings regarding . . . [w]hether efforts to reunite the juvenile with either parent clearly would be unsuccessful or inconsistent with the juvenile's health or safety and need for a safe, permanent home within a reasonable period of time." N.C.G.S. § 7B-906.1(d) (2021).

¶ 27       To assess reunification as part of the child's permanent plan, the trial court must do the following:

> make written findings as to each of the following, which shall demonstrate the degree of success or failure toward reunification:
>
> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C.G.S. § 7B-906.2(d).

As this Court recognized in *In re L.E.W.*,

> [a]lthough "use of the actual statutory language [is] the best practice, the statute does not demand a verbatim recitation of its language." Instead, "the order must make clear that the trial court considered the evidence in light of whether reunification would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time."

375 N.C. 124, 129–30, 846 S.E.2d 460, 465 (2020) (citations omitted). The trial court need only use language "sufficient to invoke th[e] statutory provision." *See In re L.N.H.*, 2022-NCSC-109, ¶ 31 (citing *In re A.P.W.*, ¶ 20). Thus, in making these findings, the trial court "must address the statute's concerns, but need not quote its exact language." *In re L.M.T.*, 367 N.C. 165, 168, 752 S.E.2d 453, 455 (2013).

Respondent-father does not contest the trial court's findings of fact related to elimination of reunification as a permanent plan, and therefore, the findings are binding on appeal. The only question for consideration on this issue is whether the trial court's findings of fact support the conclusions of law. Here, the trial court made the following relevant findings of fact in the September 22, 2020 permanency planning order:

> 7. [Respondent-father] is the biological father of the minor child. His last known address is c/o Columbus County Correctional facility, however, he was released on December 21, 2019, and his current address is

unknown . . . . Upon information and belief, [respondent-father] is residing in the State of Virginia. [Respondent-father] was served with the juvenile petition by personal service by the Columbus County Sheriff Department on June 24, 2019.

. . . .

42. Upon his release, [respondent-father] did not contact the Department or provide the Department with a current address. The Department has made numerous attempts to establish contact [with respondent-father] and, in an effort to talk with him, has also spoken with his father, who advised that [respondent-father] is not residing with him. . . . [T]he Department also spoke with [respondent-father] via Facebook. On February 10, 2020, the Department spoke with him to remind him of CFT. [Respondent-father] continued to be unable to provide the Department with his address but asserted that he would attend the upcoming meeting. He did not engage further with staff and hung up. To date, [respondent-father] has still not provided the Department with a current address.

43. The Department has made repeated attempts to contact [respondent-father] in reference to a home study and Out-of-Home service agreement being completed. On April 28, 2020, the Department spoke with [respondent-father] to inform him of the upcoming CFT on May 6, 2020, which he attended via phone call. During the CFT, [respondent-father] expressed that he wants his son back and he feels that if he was out of jail, none of this would have happened. [Respondent-father] informed the Department that he has been working for a construction company in Virginia, but due to COVID he does not work as much. . . . When asked if he provides anything for [Leon] he responded "no." [Respondent-father] became very upset with the facilitator saying "don't disrespect me" and "I'm grown just like you;" and then hung up. No further information regarding employment for [respondent-father] has been received.

44. After the CFT on May 6, 2020, the Department followed up with [respondent-father] to discuss being a placement provider for [Leon]. [Respondent-father] maintained that he would have to check with his grandmother. He did not provide an address and indicated he would call back after he spoke with his grandmother. On June 1, 2020, the Department again followed up with [respondent-father] in regards to his involvement with the Department and [Leon]. [Respondent-father] advised that he was in the process of moving again and trying to find his own place. He continues to not provide his address to the Department.

. . . .

48. With regard to the criminal history of [respondent-father], he was convicted of possession of [a firearm] by a felon and incarcerated in Columbus County Correctional Institute. [Respondent-father] has previous convictions of discharge of [a firearm], trespassing, and resisting officer. His scheduled release date was postponed due to pending infractions and the North Carolina Department of Public Safety website reflects he was released on December 21, 2019.

. . . .

60. That the [trial c]ourt finds that conditions which led to the filing of the petition continue to exist; and that the return of the child . . . to the custody of either parent would be contrary to the welfare of said child at this time.

. . . .

61: Pursuant to [N.C.G.S. § 7B-507]:

. . . .

> 2. The Chowan County Department of Social Services should no longer be required to make reasonable efforts in this matter to

reunify the child . . . with [respondent-]father . . . as those efforts would clearly be futile or would be inconsistent with the child's health and safety, and need for a safe, permanent home within a reasonable period of time.

¶ 30        As noted above, this Court takes the findings from the permanency planning orders together with those from the termination of parental rights orders. In the termination of parental rights pre-trial and adjudication order from March 26, 2021, the court made the following relevant findings of fact:

30. On December 20, 2019, [respondent-father] was released from Columbus County Correctional facility. Upon his release, he did not contact the Department to provide an[ ] updated address[ ] and phone number. The Department made contact with the prison to obtain his reported address and phone number upon his release.

. . . .

34. [Respondent-father] is and was aware that his child was and is in the custody of the Chowan County Department of Social Services, of his current placement, and has failed to participate in this case, has not made inquiry as to [Leon]'s health/welfare, nor sent any letters/cards/gifts for [Leon], has not attended one court date prior to this termination proceeding; engaged in child support in January 2021 after this matter was filed and set for hearing.

. . . .

36. [Respondent-father] refused to engage and participate with the Department. He did not provide an address to the Department . . . . He did not request the Department assess his residence for placement. All the contact [respondent-father] had with the Department was initiated by the Department.

37. [Respondent-father] only attended one PPAT meeting after being released from prison in December 2019 although he could have continued to do so virtually or in person.

38. [Respondent-father] expressed a desire to visit his son and arrange for a placement for his son, but he never submitted to a case plan, service plan, a visitation plan or requested the Department to assess his residence for placement.

39. [Respondent-father] has provided no love, nurturance, or care for the minor child and has failed to exhibit any interest in the welfare of the minor child.

40. Though duly notified of [c]ourt proceedings, [respondent-father], has provided no love, nurturance, or care for the minor child and has failed to exhibit any interest in the welfare of the minor child; has failed to engage with the Department and work toward reunification; has failed to participate in the [c]ourt process, all of which reflect a pattern consistent with willful or intentional conduct that evinces a settled purpose to forego all parental duties with regard to the minor child. In light of the evidence of the child being in custody for 16 months and based on the pattern of willful or intentional conduct that evinces a settled purpose to forego all parental duties with regard to the minor child regarding [respondent-father], the [c]ourt finds this is sufficient to establish the abandonment ground exists at the time of hearing.

41. There is a substantial risk of physical, mental, or emotional impairment of the juvenile as a consequence of the actions of [respondent-]father and the failure by [respondent-]father to provide proper care, supervision or discipline.

42. [Respondent-father] has made insufficient progress as to a change in condition in that he has failed to fully engage with the Department and work toward

reunification; and he has failed to engage in contact/visits with his child, all of which reflect a pattern consistent with the neglect of the child. Thus, there is a strong probability of repetition of neglect if the child were returned to his care. In light of the evidence of the child being in custody for sixteen months, and [respondent-]father's conduct and failure to make any progress in a reasonable amount of time; and based on the high probability of repetition of neglect and pattern of neglect regarding [respondent-father], the [c]ourt finds this is sufficient to establish the neglect ground exists at the time of hearing.

43. In October 2019, a referral was made by Chowan County Department of Social Services to Child Support Enforcement (CSE) for [respondent-father] to pay monthly child support [for Leon]. Although [respondent-father] asserts that he has been employed for periods of time since his release from prison in December 2019, he did not engage in child support until January 2021.

44. In October 2020, CSE filed a complaint for child support and made multiple service attempts on [respondent-father]. CSE had made several calls and left messages with [respondent-father] where he promised to come to the office but never appeared at the agreed upon times. During the contacts with CSE [respondent-father] did not provide an updated address for service or further contact.

45. On November 4, 2020, CSE sent a letter to [respondent-father] at his last known address . . . and advised him to contact the agency. CSE was unable to serve [respondent-father] until after [respondent-father] finally provided his Elizabeth City address to the Department in December 2020.

46. Prior to the filing of the petition for termination of parent[al] rights [respondent-father] had paid $0.00 towards the cost of care for [Leon].

47. On January 8, 2021 [respondent-father] signed a

Voluntary Support Agreement stating that he will pay $50.00 a month and $10.00 towards his arrears beginning on February 1, 2021. To date [respondent-father] has paid $120.00, on February 10, 2021.

. . . .

49. [Respondent-father] is healthy; has been under no disability that would prevent him from working; has a duty of care and support of his child; and has had the ability to pay support for [Leon] in an amount greater than $0.00.

While the exact statutory language was not used, these findings satisfy the statutory requirements of N.C.G.S. § 7B-906.2(b) and (d)(1) through (4). *See In re L.M.T.*, 367 N.C. at 168, 752 S.E.2d at 455 (explaining that the trial court "must address the statute's concerns[ ] but need not quote its exact language"). The findings satisfied N.C.G.S. § 7B-906.2(b) as they clearly demonstrate that "reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety," and, as determined by the trial court in the permanency planning order, that efforts to reunify the child with respondent-father "would clearly be futile or would be inconsistent with the child's health and safety."

Turning next to the required findings under subsection 7B-906.2(d)(1), which requires the trial court to make written findings on "[w]hether the parent is making adequate progress within a reasonable period of time under the plan," the trial court detailed the department's attempts to contact respondent-father to no avail in its findings in the permanency planning order and found that "conditions which led to

the filing of the petition continue to exist," further indicating a lack of progress. In addition, the trial court specifically found in the termination of parental rights order that "[respondent-father] has made insufficient progress as to a change in condition" and noted that the child had been in custody for sixteen months and respondent-father had "fail[ed] to make any progress in a reasonable amount of time."

¶ 33 In making the required findings under subsection 7B-906.2(d)(2) on "[w]hether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile," the trial court found in the permanency planning order that despite the repeated attempts of the department to contact respondent-father, respondent-father often could not be reached, displaying a lack of participation. Further, the trial court cited numerous examples in the termination of parental rights order that respondent-father had failed to participate with the plan and the department, finding that "[respondent-father] refused to engage and participate with the Department[,] [h]e did not provide an address to the Department," and "he never submitted to a case plan, service plan, . . . visitation plan[,] or requested the Department to assess his residence for placement."

¶ 34 Additionally, with regard to the required findings under subsection 7B-906.2(d)(3) concerning "[w]hether the parent remains available to the court, the department, and the guardian ad litem for the juvenile," the trial court found in the permanency planning order that the department was unable to establish contact with

respondent-father despite "numerous attempts" and that respondent-father "continued to be unable to provide the Department with his address."

¶ 35 Finally, pursuant to subsection 7B-906.2(d)(4), the trial court found in its permanency planning order that efforts to reunify Leon with respondent-father "would clearly be futile or would be inconsistent with the child's health and safety." The trial court included in its findings that respondent-father had a criminal history and found that the conditions which led to the filing of the petition to adjudicate Leon as a neglected juvenile "continue to exist."

¶ 36 The trial court also found in its termination of parental rights order that respondent-father had provided "no love, nurturance, or care . . . and has failed to exhibit any interest in the welfare of the minor child." Further, the trial court found that respondent-father exhibited "a pattern consistent with willful or intentional conduct that evinces a settled purpose to forego all parental duties with regard to the minor child" and that "[t]here is a substantial risk of physical, mental, or emotional impairment of the juvenile as a consequence of the actions of [respondent-]father." The trial court also found that respondent-father failed to maintain his child support obligations.

¶ 37 Even though the findings did not use the exact statutory language, these were sufficient to satisfy N.C.G.S. § 7B-906.2(b) and (d)(1) through (4), and the trial court's findings supported its conclusion that elimination of reunification was appropriate.

For the reasons stated herein, I would affirm the trial court's order allowing withdrawal of counsel and its order eliminating reunification as the permanent plan.

Chief Justice NEWBY and Justice BARRINGER join in this dissenting opinion.